**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| LINDA B. HUNTER, individually and on behalf of all similarly situated persons,<br><br>    Plaintiff,<br><br>  v.<br><br>QRS, INC.,<br><br>    Defendant. | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Linda B. Hunter, individually, and on behalf of all others similarly situated, brings this action against Defendant QRS, Inc. (referred to herein as "QRS" or "Defendant") to obtain damages, restitution and injunctive relief for the Class, as defined below, from QRS. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of counsel, and the facts that are a matter of public record:

## NATURE OF THE ACTION

1. This class action arises out of the recent data breach ("Data Breach") involving QRS, a healthcare technology services vendor that hosts the electronic patient portal for various healthcare provider clients. As a result of the Data Breach, Plaintiff and approximately 319,000 current and former patients of healthcare providers that utilized QRS's services suffered present injury and damages in the form of identity theft, loss of value of their confidential protected health information (PHI), out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the unauthorized access, exfiltration, and subsequent criminal misuse of their sensitive and highly personal information.

1

2. In addition, Plaintiff's and Class Members' sensitive personal and protected health information—which was entrusted to QRS—was compromised and unlawfully accessed due to the Data Breach.

3. Information compromised in the Data Breach includes the following information belonging to current and former patients of healthcare providers that employed QRS: names, Social Security numbers, dates of birth, patient numbers, portal usernames, addresses, and limited medical treatment and diagnosis information (collectively the "Private Information"). In addition, compromised information may include other protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and additional personally identifiable information ("PII") and protected health information ("PHI") that QRS collected and maintained through the electronic patient portals it maintained for its clients.

4. Plaintiff brings this class action lawsuit to address QRS's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

5. QRS maintained the Private Information in a reckless manner.

6. Upon information and belief, the potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to QRS, and thus QRS was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

7. In addition, QRS and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had QRS properly monitored its property, it would have discovered the breach sooner.

2

8.     Plaintiff's and Class Members' identities are now at risk because of QRS's negligent conduct since the Private Information that QRS collected and maintained is now likely in the hands of data thieves and unauthorized third-parties.

9.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based on their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a substantial and present risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

13.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to QRS's data security systems, future annual audits, and adequate credit monitoring services funded by QRS.

## PARTIES

14.     Plaintiff Linda B. Hunter is, and at all times mentioned herein was, an individual citizen of the Commonwealth of Kentucky, residing in the City of Owensboro. Plaintiff Hunter was a patient of Mukesh Gupta, M.D., who contracted with QRS to provide (among other services) patient portal services. Plaintiff Hunter was sent and received a copy of QRS's Notice of Data Breach letter, dated October 22, 2021.

15.     Defendant QRS, Inc. is a Tennessee corporation with its headquarters and principal place of business at 2010 Castaic Ln, Knoxville, TN 37932-1557.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is in the hundreds of thousands, many of whom have different citizenship from Defendant QRS, including the named Plaintiff here. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17.     This Court has jurisdiction over the Defendant because it operates and/or is incorporated in this District, and the computer systems implicated in this Data Breach are likely based in this District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Defendant is based in this District, maintains Class Members' PII and PHI in the District and have caused harm to Class Members residing in this District.

4

## QRS'S BUSINESS

19.     QRS is a vendor and business associate that provides medical care providers with practice management software and other services. According to its website, "[s]ince October 1993, the company has focused our efforts toward developing products to provide solutions for health care providers and medical services organizations."

20.     QRS offers and provides medical care providers with the:

> PARADIGM practice management suite that includes: Patient Management, Patient Scheduling, Professional Billing, Institutional Billing, Guarantor Billing, Electronic Billing, Electronic Remittance, HL7-Interfaces, Claims Error Information System, as well as specialty specific options. QRS also has expanded our original services offerings to now include: System Implementation, training at our facility, on-site training, phone/internet training, hardware installation and cabling, hardware maintenance, as well as outstanding telephone support. We also have our own mailing house to provide electronic billing for guarantor statements as well as a clearinghouse for support of both electronic claims and remittance. With PARADIGM EHR, QRS now has our own Electronic Medical Records system that is totally integrated with the PARADIGM practice management suite."

21.     Among other services, QRS hosts the electronic patient portal for certain healthcare providers. The "patient portal" is where the patients of healthcare providers that utilize QRS's services input their Private Information for their doctors and other medical care providers.

22.     In the ordinary course of interacting with the QRS patient portal, patients are required to provide sensitive personal and private information such as:

- Names;

- Dates of birth;

- Social Security numbers;

- Medical histories;

- Treatment information;

- Medication or prescription information;

- Provider information;

5

- Address, phone number, and email address, and;

- Health insurance information.

23. Because of the highly sensitive and personal nature of the information QRS acquires and stores with respect to its healthcare provider clients' patients, and by operation of the HIPAA, QRS has a legal duty to keep patient PHI safe and confidential.

24. Upon information and belief, pursuant to a "software services agreement" contract between QRS and its clients, Defendant maintained personal information related to its clients' patients on its computer systems as a result of the services it provided to its clients.

25. Upon information and belief, pursuant to that same contract between QRS and its clients, the parties specifically contracted and agreed that all data and information belonging to the patients of QRS's clients shall be held by QRS in the strictest confidence. QRS further agreed not to disclose such information to any third party without the express prior written consent of its clients or unless required by applicable law or court order.

26. Upon information and belief, that same contract between QRS and its clients expressly acknowledges that QRS will be collecting and holding HIPAA protected PHI, and that QRS is bound to follow the HIPAA Privacy Rule with regard to the PHI it collects on behalf of its clients who are HIPAA covered entities.

27. Defendant QRS, acting as a business associate and vendor of its healthcare provider clients, held the patient information collected by its clients at its servers located in Knoxville, Tennessee.

28. The patient information held by Defendant in its computer systems and networks included the Private Information of Plaintiff and Class Members.

6

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, QRS assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

30.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI.

## THE CYBERATTACK AND DATA BREACH

31.     On August 26, 2021, QRS discovered that a cyber-attacker accessed one QRS dedicated patient portal server and may have acquired certain personal information stored on that specific server.

32.     Upon discovering the attack, QRS took the server offline, began an investigation, and notified law enforcement.

33.     QRS also engaged a forensic security firm to assess the security of its network, analyze the incident, and determine the extent of the personal information that may have been accessed or acquired by the third party.

34.     The investigation determined that the attacker accessed the single server from August 23, 2021, to August 26, 2021.

35.     During this time, the attacker accessed, and likely acquired, files on the server that contained certain individuals' personal information. The information may have included, depending on the individual, their name, address, date of birth, Social Security number, patient identification number, portal username, and/or medical treatment or diagnosis information.

36.     QRS first notified its health provider clients of the incident. On October 22, 2021, on behalf of QRS's clients, QRS began sending written notifications to individuals whose personal information was accessed by the attacker and for whom QRS has contact information.

7

37.     The Data Breach remains under investigation by the U.S. Department of Health and Human Services' Office for Civil Rights.

38.     Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

39.     Plaintiff further believes her PII and PHI, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**The Data Breach Was Entirely Foreseeable**

40.     QRS had obligations created by HIPAA, contract, industry standards, and common law to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

41.     Plaintiff and Class Members provided their Private Information to QRS with the reasonable expectation that QRS would comply with its obligations to keep such information confidential and secure from unauthorized access.

42.     QRS's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

43.     In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[1]

---

[1]     *See* https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last visited Sept. 2, 2021).

8

44.     Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.[2]

45.     Defendant was aware of the risk of data breaches because such breaches have dominated the headlines in recent years. For instance, the 525 reported breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[3]

46.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[4]

47.     In 2021 alone there have been over 220 data breach incidents. These approximately 220 data breach incidents have impacted nearly 15 million individuals.

48.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.

49.     According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across U.S. healthcare organizations.  Significant security incidents are a near-

---

[2]     *Id.*

[3]     *Id.* at 15.

[4]     *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

universal experience in U.S. healthcare organizations with many of the incidents initiated by bad actors, leveraging e-mailas a means to compromise the integrity of their targets."[5]

50. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in QRS's industry, including QRS.

## QRS Fails to Comply with FTC Guidelines

51. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

52. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

53. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords

---

[5]    *See*
https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited Sept. 2, 2021).

to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

54.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55.     These FTC enforcement actions include actions against healthcare providers like QRS. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

56.     QRS failed to properly implement basic data security practices. QRS's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

57.     QRS was at all times fully aware of its obligation to protect the PII and PHI of its patients. QRS was also aware of the significant repercussions that would result from its failure to do so.

11

## QRS Fails to Comply with Industry Standards

58.     Experts studying cyber security routinely identify healthcare providers and their business associates as being particularly vulnerable to cyberattacks because of the value of the PII and PHI that they collect and maintain.

59.     Several best practices have been identified that a minimum should be implemented by healthcare providers like QRS, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data, and; limiting which employees can access sensitive data.

60.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

61.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

62.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards thereby opening the door to the cyber incident and causing the data breach.

**QRS's Conduct Violates HIPAA and Evidences Its Insufficient Data Security**

63.     HIPAA requires business associates of covered entities like QRS to protect against reasonably anticipated threats to the security of sensitive patient health information. The HIPAA privacy restrictions embodied in the Privacy Rule expressly governs the business associates of covered entities. 45 C.F.R. § 160.102. QRS, as a business associate of the medical providers that it serves, is indisputably subject to the HIPAA Privacy Rule

64.     Defendant QRS is a business associate of a "covered entity" under HIPAA. Business associates, like covered entities themselves, must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical and administrative components.

65.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data QRS left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

66.     QRS's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

13

67.     Cyberattacks like this one are considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40.[6]

## QRS'S BREACH

68.     QRS breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. QRS's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.      Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.      Failing to adequately protect patients' Private Information;

c.      Failing to properly monitor its own data security systems for existing intrusions;

d.      Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e.      Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f.      Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

---

[6]      *Id.*

14

g.      Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.      Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.      Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.      Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.      Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

l.      Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

m.      Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

n.     Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and;

o.     Failing to adhere to industry standards for cybersecurity.

69.     As the result of QRS's security deficiencies that allowed cyber-attacks to penetrate and access a QRS server, QRS negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

70.     Accordingly, as outlined below, Plaintiff's and Class Members' now face a substantial and present risk of fraud and identity theft.

**CYBERATTACKS AND DATA BREACHES PUT
CONSUMERS AT A SUBSTANTIAL AND PRESENT RISK OF FRAUD AND
IDENTIFY THEFT**

71.     PII and PHI is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used in a variety of unlawful manners.

72.     PII and PHI can be used to distinguish, identify or trace an individual's identity, such as their name, Social Security Number and medical records.

73.     This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace and mother's maiden name.

74.     Given the nature of this Data Breach, it is foreseeable that the compromised PII and PHI can be used by hackers and cybercriminals in a variety of different ways.

75.     Indeed, the cybercriminals who possess the Class Members' PII and PHI can readily obtain Class Members' tax returns or open fraudulent credit card accounts in the Class Members' names.

16

76.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[7]

77.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

78.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent

---

[7]     *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf  (last visited Apr. 12, 2019) ("GAO Report").

charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[8]

79.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

80.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[9]

---

[8]     *See* https://www.identitytheft.gov/Steps  (last visited April 12, 2019).

[9]     Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php  (last visited June 20, 2019).

18



Americans' expenses/disruptions as a result of criminal activity in their name (2016)

| | |
|---|---|
| I had to request government assistance | 29.5% |
| I had to borrow money | 60.7% |
| Had to use my savings to pay for expenses | 32.8% |
| Couldn't qualify for a home loan | 32.8% |
| I lost my home/place of residence | 31.1% |
| I couldn't care for my family | 34.4% |
| Had to rely on family/friends for assistance | 49.2% |
| Lost out on an employment opportunity | 44.3% |
| Lost time away from school | 19.7% |
| Missed time away from work | 55.7% |
| Was generally inconvenienced | 73.8% |
| Other | 23% |
| None of these | 3.3% |

Source: Identity Theft Resource Center

creditcards•com

81.     Moreover, theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[10]  Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

82.     Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance

---

[10]     *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

19

provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[11]

83.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

84.     It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

85.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

86.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and

---

[11]     *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited March 18, 2020).

Class Members are at a substantial and present risk of fraud and identity theft for many years into the future.

87.     Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

88.     Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[12]

89.     PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

90.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[13] Such fraud may go undetected until debt collection calls commence months, or even years, later.

91.     Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[14]

92.     Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[12]     *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[13]     *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 3, 2021).

[14]     *Id.* at 4.

93.    Moreover, it is not an easy task to change or cancel a stolen Social Security number.

94.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[15]

95.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[16]

96.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[17]

97.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

98.    For this reason, QRS knew or should have known about the dangers of cyber-attacks like this one, and strengthened its data security systems accordingly. QRS was put on notice

---

[15]    Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[16]    Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[17]https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content. (last accessed November 19, 2020)

22

of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

99.     To date, QRS has done absolutely nothing to provide Plaintiff and the Class Members with relief for the damages they have suffered as a result of the Data Breach. QRS does not even appear to be offering free credit monitoring to all 319,000 persons affected by this Data Breach, but rather is selectively offering an inadequate single year of credit monitoring to only those persons like Plaintiff Hunter whose Social Security numbers were accessed and stolen in the Data Breach.

100.     Moreover, the fraud and identity monitoring services offered by Defendant are wholly inadequate as the services are only offered for 12 months. The time burden associated with the credit monitoring offered is placed squarely on Plaintiff and the few Class Members who were offered this service, by requiring them to expend time signing up for the credit monitoring service, as opposed to automatically enrolling all victims of this cybercrime.

101.     Plaintiff typically takes measures to protect her Private Information, and is very careful about sharing her Private Information. She has never knowingly transmitted unencrypted PII or PHI over the internet or any other unsecured source, and believed that when she submitted information via the QRS patient portal, the information would be secure and encrypted.

102.     Plaintiff stores any documents containing her Private Information in a safe and secure location. Moreover, she diligently chooses unique usernames and passwords for her online accounts.

103.     To the best of her knowledge, Plaintiff's Private Information was never compromised in any other data breach.

23

104.    Plaintiff's and Class Members' names, addresses, dates of birth, Social Security Numbers, medical diagnosis, and other PHI were all compromised in the Data Breach and are now in the hands of the cybercriminals who accessed Defendant's computer system.

105.    Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

106.    Plaintiff's PII and PHI was compromised as a direct and proximate result of the Data Breach.

107.    After and as a result of the Data Breach, Plaintiff has experienced a substantial increase in suspicious spam phone calls, up to 20-25 per day beginning as early as 7 am CST and continuing up until 9 pm CST, all of which appear to be placed with the intent to obtain personal information to commit identity theft by way of a social engineering attack.

108.    Since being notified of the Data Breach on or about October 22, 2021, Plaintiff has spent time monitoring her confidential accounts for fraud and dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time included time spent on the telephone and sorting through her unsolicited spam phone calls, verifying the legitimacy of the Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

109.    Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

110.    As a direct and proximate result of QRS's conduct, Plaintiff and Class Members have been placed at a substantial and present risk of harm from fraud and identity theft.

24

111.    As a direct and proximate result of QRS's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

112.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

113.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and Class Members.

114.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

115.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

116.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial and medical accounts and records for misuse. Indeed, QRS's own notice of data breach provides instructions to Plaintiff and Class Members about all the time that they will need to spend monitor their own accounts, or to establish a "security freeze" on their credit report.[18]

117.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket

---

[18]      https://QRS.org/notice-of-security-incident/ (last accessed November 19, 2020)

expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

     a.     Finding fraudulent charges;

     b.     Canceling and reissuing credit and debit cards;

     c.     Purchasing credit monitoring and identity theft prevention;

     d.     Addressing their inability to withdraw funds linked to compromised accounts;

     e.     Taking trips to banks and waiting in line to obtain funds held in limited accounts;

     f.     Placing "freezes" and "alerts" with credit reporting agencies;

     g.     Spending time on the phone with or at a financial institution to dispute fraudulent charges;

     h.     Contacting financial institutions and closing or modifying financial accounts;

     i.     Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

     j.     Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled, and;

     k.     Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

118.     Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of QRS, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

119.    Further, as a result of QRS's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

120.    As a direct and proximate result of QRS's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and are at an imminent and increased risk of future harm.

## CLASS REPRESENTATION ALLEGATIONS

121.    Plaintiff brings this suit on behalf of herself and a class of similarly situated individuals under Federal Rule of Civil Procedure 23, which is preliminarily defined as:

> All persons QRS identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.

Excluded from the class are any judges presiding over this matter and court personnel assigned to this case.

122.    **Numerosity**: The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, but are reported to be at least 319,000. The identities of Class Members are ascertainable through QRS's records, Class Members' records, publication notice, self-identification, and other means.

123.    **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether QRS unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

27

b.      Whether QRS failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      Whether QRS's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.      Whether QRS's data security systems prior to and during the Data Breach were consistent with industry standards;

e.      Whether QRS owed a duty to Class Members to safeguard their Private Information;

f.      Whether QRS breached its duty to Class Members to safeguard their Private Information;

g.      Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.      Whether QRS knew or should have known that its data security systems and monitoring processes were deficient;

i.      Whether Plaintiff and Class Members suffered legally cognizable damages as a result of QRS's misconduct;

j.      Whether QRS's conduct was negligent;

k.      Whether QRS's conduct was *per se* negligent, and;

l.      Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

124.    Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach.

125.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

126.    **Predominance**. QRS has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

127.    **Superiority**. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for QRS. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

29

128.     QRS has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

129.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether QRS owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b.     Whether QRS's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

c.     Whether QRS's failure to institute adequate protective security measures amounted to negligence;

d.     Whether QRS failed to take commercially reasonable steps to safeguard consumer Private Information; and

e.     Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the data breach.

130.     Finally, all members of the proposed Class are readily ascertainable. QRS has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by QRS.

30

# CLAIMS FOR RELIEF

## COUNT I
**Negligence**

131.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1-130 as if fully set forth herein. Plaintiff brings this claim on behalf of herself and the Class.

132.    QRS knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

133.    QRS had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Private Information.

134.    QRS had a duty to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to Tenn. Code. §§ 47-18-2105 to 2107 (2005).

135.    QRS had a duty to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to Tenn. Code. § 47-18-2110 (2018).

136.    QRS had a duty to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to Tenn. Code. § 39-14-150(G).

137.    QRS systematically failed to provide adequate security for data in its possession.

138.    QRS, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within QRS's possession.

31

139.    QRS, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' Private Information.

140.    QRS, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the Private Information within QRS's possession might have been compromised and precisely the type of information compromised.

141.    QRS's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised.

142.    As a result of QRS's ongoing failure to notify Plaintiff and Class Members regarding what type of Private Information has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

143.    QRS's breaches of duty caused Plaintiff and Class Members to suffer from identity theft, loss of time and money to monitor their finances for fraud, and loss of control over their Private Information.

144.    As a result of QRS's negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

145.    Plaintiff seeks the award of actual damages on behalf of herself and the Class.

146.    In failing to secure Plaintiff's and Class Members' Private Information and promptly notifying them of the Data Breach, QRS is guilty of oppression, fraud, or malice, in that QRS acted or failed to act with a willful and conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, therefore, in addition to seeking actual damages, seeks punitive damages on behalf of himself and the Class.

32

147.    Plaintiff seeks injunctive relief on behalf of the Class in the form of an order compelling QRS to institute appropriate data collection and safeguarding methods and policies with regard to patient information.

## COUNT II
### Negligence *Per Se*

148.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1-130 as if fully set forth herein. Plaintiff brings this claim on behalf of herself and the Class.

149.    Pursuant to Section 5 of the FTC Act, and Tennessee law (*E.g.*, Tenn. Code. §§ 47-18-2105 to 2107 (2005)), QRS was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Private Information.

150.    Plaintiff and Class Members are within the class of persons whom Section 5 of the FTC Act and Tenn. Code. §§ 47-18-2105 to 2107 were among the specific class of people that these statutes were designed to protect, in that the

151.    QRS breached its duties by failing to employ industry standard data and cybersecurity measures to gain compliance with those laws, including, but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

152.    It was reasonably foreseeable, particularly given the growing number of data breaches of health information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to QRS's networks, databases, and computers that stored or contained Plaintiff's and Class Members' Private Information.

33

153. Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to QRS's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

154. QRS's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' unencrypted Private Information and Plaintiff and Class Members have suffered and will continue to suffer damages as a result of QRS's conduct. Plaintiff and Class Members seek damages and other relief as a result of QRS's negligence.

## COUNT III
### Violations of the Tennessee Consumer Protection Act of 1977
### Tenn. Code Ann. § 47-18-101, *et seq*.

154. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 130 above as if fully set forth herein. Plaintiff brings this claim on behalf of herself and the Class.

155. Plaintiff brings this cause of action pursuant to Federal Rule of Civil Procedure 23, which, procedurally, displaces any state procedural statutory ban on class actions under Tennessee's Consumer Protection Act ("TCPA").

156. Plaintiff and Class Members are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2).

157. QRS is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

158. The TCPA prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18- 104.

159. By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by:

34

a) failing to maintain adequate computer systems and data security practices to safeguard Private Information;

b) failing to disclose that their computer systems and data security practices were inadequate to safeguard Private Information from theft;

c) continued gathering and storage of Private Information and other personal information after Defendant knew or should have known of the security vulnerabilities of their computer systems that were exploited in the Data Breach;

d) making and using false promises, set out in the Privacy Notice, about the privacy and security of Private Information of Plaintiff and Class Members, and;

e) continued gathering and storage of PII and other personal information after Defendant knew or should have known of the Data Breach and before Defendant allegedly remediated the data security incident.

160. These unfair acts and practices violated duties imposed by laws, including but not limited to the Federal Trade Commission Act, HIPAA, and Tenn. Code Ann. § 47-18-101, *et seq.*

161. The foregoing deceptive acts and practices were directed at consumers.

162. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the character of the services provided, specifically as to the safety and security of Private Information.

163. QRS's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth in this Complaint are material in that they relate to matters which reasonable persons, including Plaintiff and members of the Class, would attach importance to in making their decisions and/or conducting themselves regarding the services received from QRS.

35

164.     Plaintiff and Class members are consumers who made payments to the clients of QRS for the furnishing of healthcare services that were primarily for personal, family, or household purposes.

165.     QRS engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the furnishing of employment benefit services to consumers, including Plaintiff and Class Members.

166.     QRS engaged in, and its acts and omissions affect, trade and commerce, or the furnishing of services in the State of Tennessee.

167.     QRS's acts, practices, and omissions were done in the course of QRS's business of furnishing healthcare providers with patient portal and other services in the State of Tennessee.

168.     As a direct and proximate result of QRS's multiple, separate violations of the Tennessee CPA, Plaintiff and the Class Members suffered damages including, but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in QRS's possession and is subject to further unauthorized disclosures so long as QRS fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession, and; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

36

169.     Also as a direct result of QRS's violation of the Tennessee CPA, Plaintiff and the Class Members are entitled to damages as well as injunctive relief, including, but not limited to, ordering QRS to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

170.     Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from QRS's unfair, deceptive, and unlawful practices. QRS's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

171.     QRS knew or should have known that its computer systems and data security practices were inadequate to safeguard Class Members' PII and that the risk of a data security incident was high.

172.     As a result, Plaintiff and the Class Members have been damaged in an amount to be proven at trial.

173.     On behalf of herself and other members of the Class, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover his actual damages, three times actual damages, and reasonable attorneys' fees.

## COUNT IV
**Intrusion Upon Seclusion/Invasion of Privacy (Electronic Intrusion)**

155.     Plaintiff re-alleges each and every allegation contained in Paragraphs 1-130 above, and incorporates by reference those paragraphs as if fully set forth herein. Plaintiff brings this claim on behalf of herself and the Class set forth above.

37

156.    Plaintiff and Class Members maintain a privacy interest in their Private Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above.

157.    Plaintiff and Class Members' Private Information was contained, stored, and managed electronically in QRS's records, computers, and databases that was intended to be secured from unauthorized access to third-parties because it contained highly sensitive, confidential matters regarding Plaintiff's and Class Members' identities, unique identification numbers, medical histories, and financial records that were only shared with QRS for the limited purpose of obtaining and paying for healthcare, medical goods and services.

158.    Additionally, Plaintiff's and Class Members' Private Information, when contained in electronic form, is highly attractive to criminals who can nefariously use their Private Information for fraud, identity theft, and other crimes without their knowledge and consent.

159.    QRS's disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties as a result of its failure to adequately secure and safeguard their Private Information is offensive to a reasonable person. QRS's disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties permitted the physical and electronic intrusion into Plaintiff's and Class Members' private quarters where their Private Information was stored and disclosed private facts about their health into the public domain.

160.    Plaintiff and Class Members have been damaged by QRS's conduct, by incurring the harms and injuries arising from the Data Breach now and in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on her own and behalf of all others similarly situated, prays for relief as follows:

A.      For an Order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and the undersigned as Class Counsel;

B.      Awarding monetary, punitive and actual damages and/or restitution, as appropriate;

C.      Awarding declaratory and injunctive relief as permitted by law or equity to assure that the Class has an effective remedy, including enjoining QRS from continuing the unlawful practices as set forth above;

D.      Prejudgment interest to the extent allowed by the law;

E.      Awarding all costs, experts' fees and attorneys' fees, expenses and costs of prosecuting this action; and

F.      Such other and further relief as the Court may deem just and proper.


Dated: November 30, 2021                         Respectfully submitted,

                                                 John Spragens, TN BPR No. 31445
                                                 **SPRAGENS LAW PLC**
                                                 311 22nd Ave. N.
                                                 Nashville, TN 37203
                                                 T: (615) 983-8900
                                                 F: (615) 682-8533
                                                 john@spragenslaw.com

39

Gary E. Mason*
David K. Lietz*
**MASON LIETZ & KLINGER LLP**
5301 Wisconsin Avenue, NW
Suite 305
Washington, DC 20016
Tel: (202) 429-2290
gmason@masonllp.com
dlietz@masonllp.com

Gary M. Klinger*
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (202) 429-2290
gklinger@masonllp.com

*pro hac vice to be filed                    *Attorneys for Plaintiff and the Proposed Class*